# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## BRYSON CITY DIVISION

### Civil Case No. 2:07cv023
### [Criminal Case No. 2:04cr038]

| | | |
|---|---|---|
| **LONNIE MACK OGLESBEE,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM OF** |
| _____ | ) | **DECISION AND ORDER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____) | | |

**THIS MATTER** is before the Court upon Petitioner's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 [Doc. 1]; Respondent's Motion for Summary Judgment [Doc. 12]; and Petitioner's Response to Respondent's Motion for Summary Judgment [Doc. 25].

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner, an American Indian, was charged with assaulting and kidnaping his wife, also an American Indian, and sexually abusing their three daughters at various times in 2003 and 2004. All incidents took place at the family home within the boundaries of the Eastern Band of Cherokee Indian Reservation. Jurisdiction resided in the Federal District Court pursuant to 18

U.S.C. § 1153(a).

On October 19, 2004, Petitioner was convicted after a trial by jury of three counts of assault with a deadly weapon with intent to do bodily injury (Counts Fourteen, Sixteen, Eighteen), three counts of assault resulting in serious bodily injury (Counts Fifteen, Seventeen, Nineteen), one count of kidnaping (Count Twenty), and six counts of aggravated sexual assault (Counts Twenty-One through Twenty-Six), in violation of 18 U.S.C. §§ 113(a)(3), (a)(6); 1153; 1201; 2241(a) (2000). United States v. Oglesbee, 177 Fed.Appx. 359, 360 (4th Cir. 2006), *certiorari denied* 549 U.S. 987, 127 S.Ct. 462, 166 L.Ed.2d 329 (2006). Petitioner was sentenced on the various counts to life imprisonment. Id. He appealed, and his convictions and sentences were affirmed by the Fourth Circuit in an unpublished opinion. Id. Petitioner's Petition for Writ of Certiorari was denied by the Supreme Court. Oglesbee v. United States, 549 U.S. 987, 127 S.Ct. 462, 166 L.Ed.2d 329 (2006).

The trial focused primarily on the three assaults alleged in the indictment and on the aggravated sexual abuse of Petitioner's daughters.

### The Glass Jar Incident

The Government's evidence showed that on or about January 27, 2004, Petitioner began hitting his wife. His wife was seated at the time, and in the process of drawing up her legs to protect herself, she knocked over a glass

2

jar containing tea, which splattered on Petitioner. He picked up the jar and threw it at her head. She attempted to block the jar with her hand, and it broke her finger. The break was severe, causing the broken bone to tear through and protrude from her skin. [Criminal Case No. 2:04cr38, Doc. 49: Trial Tr. Vol. I, 93-94, 170-71.]

Petitioner initially refused to let his wife seek treatment for her injury, telling her to get her "pigs" (meaning the police) and "bring them down," and that he would "take some of them out with [him]." [Id. at 94-95, 171-172, 204, 232.] Eventually, the pain in his wife's finger overrode her fear of Petitioner, and she left for the hospital after telling him that she would not contact the police and would tell the doctors that she had broken her finger carrying firewood. [Id. at 98-99, 143, 258.] She smeared mud on her clothes before leaving to make her story of carrying firewood more convincing. [Id. at 99, 172-73.] When she left, Petitioner was sitting in a chair with a rifle across his legs; he told her that "he would be there waiting for the cops to get there." [Id. at 205; 98, 221-22, 233.] Although there was conflicting testimony regarding the length of time between the injury and his wife's departure for the hospital, Petitioner did not dispute that it was about an hour and a half to two hours. [Case No. 2:04cr38, Doc. 50: Trial Tr. Vol. II, 309-11.]

Petitioner testified that he did not throw the jar at his wife, but away from

her, and that she intentionally "backhanded the jar in a badminton style . . ."
[Id. at 282, 308.] He also testified that he did not prevent her from leaving, that she delayed her trip to the hospital, and that "she's tough and she was not crying" after her finger was broken. [Id. at 309-10.]

### *The Baseball Bat Incident*

On or about March 11, 2004, Petitioner and his wife were arguing when he struck her in the middle of the back with an aluminum baseball bat, causing her to fall. [Trial Tr. Vol. I, 106, 174-75, 206.] He then hit her on the hip at least three times as she lay prone, leaving a bruise the size of a basketball. [Id. at 105-106, 174-75, 258-59.] Petitioner's two oldest daughters and his son witnessed some or all of this assault. [Id. at 174-75, 206, 258-59.]

Petitioner testified that his wife had the bat and that she was asking him to insert it into her vagina. He testified that he refused and that she was hit while he was trying to take the bat away from her. [Trial Tr. Vol. II, 283-86.] He could not account for why his children did not hear their mother make the alleged request, or why her bruising was so severe. [Id. at 316-18.]

### *The Stun Gun Incident*

Beginning on March 14 and continuing into March 15, 2004, Petitioner repeatedly shocked his wife with a stun gun. [Trial Tr. Vol. I, 112-13, 176, 207-08, 236-37, 260.] He told "R.O.," his oldest daughter, that God told him

to use the stun gun on his wife because it was his turn to have fun. [Id. at 176.] When the batteries ran low, he asked "H.O.," his middle daughter, to go out and buy $300 worth of 9-volt batteries for the gun; she did not comply. [Id. at 176, 208.]

Petitioner testified that he and his wife were taking turns shocking themselves and that he laughed when he got shocked. [Trial Tr. Vol. II, 287, 322-24.] He claimed that the whole episode lasted less than an hour. [Id. at 323.]

### Aggravated Sexual Assault

Evidence at trial also revealed that Petitioner sexually abused his three daughters over a period of two years. The first offense occurred in November, 2003. Petitioner required "R.O." to "help him to maintain an erection . . ." during his sexual activities with his wife, "R.O.'s" mother. [Trial Tr. Vol. I, 120-21, 178-179.] He forced "R.O." to manually stimulate his penis and to perform oral sex on him. [Id. at 120-21, 125, 179-82.] If she resisted, he used physical force to get her to comply. [Id. at 181-82.] Additionally, he fondled her breasts and genitals. [Id. at 120-22, 179-80.] These abuses recurred two or three times a week. [Id. at 123, 181.] Petitioner told "R.O." that she was "under his protection," which she understood from prior conversations to mean that she was "either a wife or a concubine." [Id. at 180-81.]

When "R.O." was unavailable to him due to her menstrual cycle, Petitioner involved his 18-year-old middle daughter, "H.O.," in his sexual activities with his wife. [Trial Tr. Vol. I, 124-27.] Petitioner would fondle her genitals, perform oral sex on her, force her to perform oral sex on him, and force her to manually stimulate his penis. [Id. at 125-29, 212-16.] On other occasions he would penetrate her vagina with his finger, purportedly to see if she was still a virgin. [Id. at 213-14, 216] He told her that "Lot's daughters had laid with Lot and they had children by him," and that she was "under his protection" for having complied. [Id. at 124-25, 212.] This abuse occurred approximately two or three times a week [Id. at 213] and sometimes involved Petitioner, "R.O.," "H.O.," and their mother together. [Id. at 128, 183-84.]

Petitioner's youngest daughter, "A.O.," did not escape the abuse. In early March, 2004, after a particularly savage beating, Petitioner pulled up "A.O.'s" skirt and digitally penetrated her and forced her to kiss his penis. [Trial Tr. Vol. I, 238-41.] He also digitally penetrated her for the stated purpose of seeing if she was still a virgin, accusing her of sexual activity with her younger brother, "J.O." [Id. at 243-44.]

For his part, Petitioner denied all sexual activity with his daughters. [Trial Tr. Vol. II, 287-88.] He testified that they and their mother "pushed him in that direction," suggesting that they attempted to draw him into sexual

activity.  [Id. at 326-27.]

Petitioner filed a timely Motion to Vacate, Set Aside or Correct Sentence in this Court on October 19, 2007.  [Doc. No. 1.][1]  Due to the disjointed, rambling, and repetitive nature of the allegations raised in the Motion, the Court delineated the recognizable claims and ordered the Government to respond to the following issues:  ineffective assistance of counsel for failing to prepare for trial, for failing to prepare a diminished capacity defense, for failing to investigate Petitioner's wife's motives in testifying against him, for failing to hire an expert to prove that some of his wife's testimony was false, for failing to dismiss jurors that Petitioner wanted dismissed, for failing to properly question Petitioner during his testimony, for failing to oppose testimony concerning Petitioner's possession of an AK-47, and for failing to seek a change of venue; and prosecutorial misconduct for permitting Petitioner's wife to testify falsely that he had broken her finger, and for eliciting testimony of Petitioner's ownership of weapons, including an AK-47, for the sole purpose of portraying Petitioner as a "bad man."  [Doc. 2.]

By the same Order, the Court dismissed Petitioner's claim that counsel

---

[1]Petitioner's one-year statute of limitations expired on October 16, 2007, one year after his petition for a writ of *certiorari* was denied by the Supreme Court.  28 U.S.C. § 2255(f)(1).  Although Petitioner's Motion to Vacate was not received in this Court until October 19, 2007, it was signed and dated October 11, 2007, making it timely.  Rules Governing Section 2255 Proceedings, Rule 3(d), 28 U.S.C. § 2255.

was ineffective for failing to "defend [his] rights" as too vague to state a constitutional claim for relief. [Id. at 2 n.1.] The Court also dismissed Petitioner's claim that the prosecutor engaged in misconduct when he argued that the victims still were afraid of Petitioner despite the fact that he was in leg shackles because the Fourth Circuit had determined on direct appeal that even if the remark was prejudicial, it could not have violated Petitioner's right to a fair trial given the "volume of evidence of [Petitioner's] guilt." [Id., *citing* Davis v. United States, 417 U.S. 333, 342, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974); Boeckenhaupt v.United States, 537 F.2d 1182 (4th Cir. 1976), *certiorari denied* 429 U.S. 863, 97 S.Ct. 169, 50 L.Ed.2d 142 (1976).]

Respondent filed a Response and a Motion for Summary Judgment. [Docs. 11 & 12.] Petitioner subsequently filed a Response to the Motion for Summary Judgment, in which he raised additional claims of constitutional violations. [Doc. 25.] Petitioner has not moved to amend his Motion to Vacate to add these additional claims. Therefore, the Court will not consider them." Mayle v. Felix, 545 U.S. 644, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005).

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a).[2] "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003), *certiorari denied* 541 U.S. 1042, 124 S.Ct. 2171, 158 L.Ed.2d 732 (2004), *quoting* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). A genuine issue of fact exists if "'a reasonable jury could return a verdict for the nonmoving party.'" Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), *certiorari denied* 513 U.S. 814, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994), *quoting* Anderson, 477 U.S. at 248.

"Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. Id. (citation

---

[2] Rule 56 was amended effective December 1, 2010. The version as amended is quoted here. It is applicable to this case because such retroactive application does not work an injustice and the Supreme Court has not specified otherwise. Fed. R. Civ. P. 86(a)(2). The quoted portion is, in substance, the same as what was in effect at the filing of the Motion for Summary Judgment.

omitted).

> A party opposing a properly supported motion for
> summary judgment may not rest upon the mere
> allegations or denials of his pleadings, but rather must
> set forth specific facts showing that there is a genuine
> issue for trial. Furthermore, neither unsupported
> speculation, nor evidence that is merely colorable or
> not significantly probative, will suffice to defeat a
> motion for summary judgment; rather, if the adverse
> party fails to bring forth facts showing that reasonable
> minds could differ on a material point, then,
> regardless of any proof or evidentiary requirements
> imposed by the substantive law, summary judgment,
> if appropriate, shall be entered.

Id. (internal citations and quotation marks omitted).


# DISCUSSION

## Ineffective Assistance of Counsel.

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. Amend. VI. In addition, case law requires that to satisfy this right, the assistance must be effective. Strickland v. Washington, 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.").

In order to establish a claim for relief for ineffective assistance of

counsel, Petitioner must demonstrate that counsel's performance was deficient, that is, that it fell below an objective standard of reasonableness when considered in light of the prevailing norms of practice and that such deficiency prejudiced him such that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 687-88, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

In reviewing claims of ineffective assistance of counsel, "[j]udicial scrutiny of counsel's performance must be highly deferential;" therefore, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." Id. at 689. Furthermore, the petitioner "bears the burden of proving Strickland prejudice," and if he fails to do so "a reviewing court need not consider the performance prong." Fields v. Attorney Gen. of Md., 956 F.2d 1290, 1297 (4th Cir. 1992), *certiorari denied* 506 U.S. 885, 113 S.Ct. 243, 121 L.Ed.2d 176 (1992) (citations omitted).

### 1. Diminished Capacity Defense

Petitioner contends that throughout the time that he was alleged to have sexually abused his daughters, he suffered from "sexual diseases," erectile

dysfunction, a prostate infection, a kidney infection, and "a fever in the brain," all of which he was unaware of until jailed on the instant charges. [Doc. 25, at 3.] He contends that all of these ailments were discovered when he was given a medical examination at the jail, and that he was treated for them there. He claims that counsel was ineffective for failing to obtain his medical records from the jail and for failing to put on a diminished capacity defense.

Petitioner's arguments with respect to this claim are confusing and contradictory. On the one hand, he repeatedly proclaims his innocence of any sexual contact with his daughters, instead claiming that they attempted to seduce him. On the other hand, he contends that counsel should have put on a "diminished capacity" defense based on the presence of all of his "sexual diseases."

Petitioner, however, seems to be confused about the nature and implications of a diminished capacity defense. In fact, it is not clear from the Motion whether Petitioner's argument is that he was physically incapable of sexual activity with his daughters or whether he suffered from diminished mental capacity. Regardless, he cannot show that counsel was ineffective for failing to put on a diminished capacity defense.

If his argument is that counsel should have produced his medical records to show that he was physically incapable of sexually abusing his

daughters, he cannot show that such a defense had a reasonable probability of success.  According to defense counsel, Petitioner operated under the belief that he was not guilty of the sexual abuse because he could not maintain an erection. [Doc. 11, Ex. 6, at ¶ 2.] However, none of the elements of the charged offenses required that Petitioner maintain an erection.  [Id., at Ex. 1, at 8-13.]  Therefore, his inability in that regard could not have provided the basis of any defense to the charges.

If Petitioner's argument is that counsel should have produced his medical records and expert testimony to show that he was incapable of forming the intent to sexually abuse his daughters because he suffered from various "sexual diseases," he cannot show that such a defense had a reasonable probability of success.  Counsel states that he obtained copies of Petitioner's medical records from the Buncombe County Detention Center, and it was his opinion that they did not prove any of Petitioner's claims.  [Id., at Ex. 2, at ¶ 2.]  Furthermore, had counsel put forth a diminished capacity defense in the form of expert testimony, the Government could have put on rebuttal evidence taken from Petitioner's court-ordered psychiatric examination.[3]  United States v. Curtis, 328 F.3d 141, 144-145 (4th Cir. 2003)

---

[3]Petitioner was ordered by the Court to undergo a psychiatric examination to determine whether he was competent to stand trial and whether at the time of the offenses, he was criminally responsible pursuant to 18 U.S.C. § 4242.  [Criminal Case No. 2:04cr038, Doc. 23.]

("When a defendant asserts a mental status defense and introduces psychiatric testimony in support of that defense, he may face rebuttal evidence from the prosecution taken from his own examination . . . [.]").

The report from Petitioner's psychiatric examination states that Petitioner was given a physical examination, including history and laboratory work. [Criminal Case No. 2:04cr038, Doc. 28-1 at 2 (sealed).] There is nothing in the report, however, that supports Petitioner's current contention that he suffered from "sexual diseases" that affected his ability to appreciate the nature or wrongfulness of his acts at the time that he committed them. Nor did Petitioner report to examiners that he suffered from "sexual diseases." [Id., at 5 (noting that Petitioner reported no physical health problems) (sealed).] Additionally, the Government could have called the mental health experts who examined Petitioner to testify that there was nothing to indicate that Petitioner was "significantly impaired by mental illness" at the time of the offenses and that his psychological test results suggested that he was a resentful, suspicious individual who refused to take responsibility for his actions and externalized blame for his problems. [Id. at 8, 6]; Curtis, 328 F.3d at145 ("[A] defendant has no Fifth Amendment protection against the introduction of mental health evidence in rebuttal. In essence, the defendant waives his right to remain silent ... by indicating that he intends to introduce

psychiatric testimony.) (citation omitted). In short, there was nothing helpful but a great deal that was harmful to Petitioner in his evaluation that the Government could have used against him in rebuttal had counsel attempted a diminished capacity defense.

Not only has Petitioner failed to put forth any evidence that he suffered from "sexual diseases" that impaired his ability to appreciate the criminality of his conduct at the time of the offenses, he has failed to put forth evidence that he suffered from any relevant physical or mental ailment. Furthermore, he has failed to show that there is a reasonable probability that a diminished capacity defense would have resulted in an acquittal on the sex abuse charges. Therefore, he can meet neither the deficiency nor the prejudice requirements under <u>Strickland</u>, and his claim must be denied. 466 U.S. at 687-88, 694.

### 2. Wife's Testimony

Petitioner asserts that his wife testified falsely at trial regarding "the glass jar incident." He claims that counsel was ineffective for failing to investigate his wife's motives for testifying against him and for failing to hire an expert to prove that his wife's finger could not have been broken in the manner that she claimed. He also claims that the prosecutor elicited perjured testimony from Petitioner's wife regarding how her finger was broken.

As an initial matter, Petitioner has failed to show that his wife testified falsely at trial. Both he and his wife testified regarding the glass jar incident, and the jury found her testimony to be credible. Petitioner's daughters, while not having witnessed the incident, corroborated her testimony that Petitioner refused to allow her to seek medical attention because he did not want her to tell the police how she broke her finger. Furthermore, Petitioner's assertion that "an expert" could have looked at an x-ray of his wife's broken finger and testified that, based upon the trajectory and velocity of the glass jar when it hit, the finger could not have been broken in the manner his wife claimed, is based on pure conjecture. Petitioner has failed to point to anything in either his or his wife's testimony that would have provided sufficient information about trajectory and velocity to have supported a medical or scientific opinion that the finger was broken when his wife backhanded the jar rather than when she brought her hand up to protect her face, as she testified.

Counsel's duty was to make *reasonable* investigations or to make a *reasonable* decision that certain investigations were unnecessary, it was not to indulge Petitioner in the fanciful or futile. Strickland, 466 U.S. at 691. Petitioner has not identified any evidence connected to the glass jar incident that would have led a reasonable attorney to consult an "expert." Similarly, Petitioner has failed to advance any rational reason that counsel should have

investigated whether Petitioner's wife had a motive for testifying against him beyond the well-supported allegations of brutality and abuse in this case.[4]

Finally, in order to succeed on a claim of prosecutorial misconduct based upon perjured trial testimony, a petitioner first must show that the testimony was, in fact, false, and second, that the Government knowingly used the perjured testimony in order to secure the conviction. Boyd v. French, 147 F.3d 319, 330 (4th Cir. 1998), *certiorari denied* 525 U.S. 1150, 119 S.Ct. 1050, 143 L.Ed.2d 56 (1999), *citing* Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Here Petitioner has done nothing more than show that his wife's testimony was, at most, inconsistent in some respects with the testimony of others. However, "[m]ere inconsistencies in the testimony by government witnesses do not establish the government's knowing use of false testimony." United States v. Griley, 814 F.2d 967, 971 (4th Cir. 1987) (citation omitted).

Having failed to show that his wife testified falsely, Petitioner cannot show that the prosecutor engaged in misconduct by eliciting false testimony. Consequently, Petitioner cannot succeed on any of his claims connected to his wife's testimony about the glass jar incident.

---

[4]The Court notes that counsel did ask questions of Petitioner's wife on cross-examination that implied that she had made up a story of abuse so that she could obtain sole ownership of the couple's property. [Trial Tr. Vol. 1, 151:13-153:23, 162.]

### 3. Jury Selection

Petitioner also claims that counsel was ineffective for failing to dismiss several jurors at his request.  Respondent was unable to address this claim with any specificity in the Response because Petitioner did not identify the jurors in his Motion to Vacate.  In his Response to Respondent's Motion for Summary Judgment, Petitioner named jurors Morris, Bishop, Beasley, and Denton as those that he asked his attorney to dismiss.  For his part, counsel had no memory of Petitioner asking that particular jurors be dismissed.  [Doc. 11, Ex. 6, at ¶4.]

According to Petitioner, he requested that counsel dismiss Juror Morris because Morris "admitted that he was prejudiced against" Petitioner.  [Doc. 25, at 4.]  During voir dire, Morris revealed that his wife grew up in an abusive household.  [Trial Tr. Vol. I, 55:18-19.]  When asked whether his wife's situation would in any way effect how he decided the case against Petitioner, Morris responded:  "As far as assuming guilt, no.  Some prejudice against it if the evidence is there, having helped my wife to heal . . . and knowing the damage that it does do first hand."  [Id. at 56:5-10.]  Counsel followed up, asking if Morris would be able to "view this evidence, weigh its credibility, determine whether you believe it or not, and give the defendant the benefit of any reasonable doubt?"  [Id. at 56:20-23.]  Morris answered that he would be

able to do that.  [Id. at 56: 24.]  The record, therefore, reveals that Morris did not admit to being prejudiced against Petitioner but instead stated that he would not assume guilt based on the charges and that he could view the evidence and weigh the credibility of the witnesses objectively.

It appears that Petitioner wanted jurors Bishop, Beasley, and Denton dismissed because they either worked with law enforcement or had relatives who worked in law enforcement.  [Doc. 25, at 22; Doc. 25-1, at 9.]  Bishop was a 911 operator; Beasley's daughter worked in a county jail, and Denton had two nephews in law enforcement.  [Trial Tr. Vol. I, 19, 68, 69.]  All stated during voir dire, however, that their contact with or their relationship to those in law enforcement would not affect their ability to be fair and impartial.  [Id. at 19-20, 68-70.]

Petitioner has not shown a reasonable probability that the removal of any these jurors would have changed the outcome of the case.  Strickland, 466 U.S. at 694.  The trial transcript offers no evidence that counsel's actions resulted in the seating of a juror biased or otherwise prejudiced against Petitioner.  All of the jurors in question unequivocally told the trial judge and the attorneys that they could give Petitioner a fair and impartial trial. Furthermore, the evidence against Petitioner simply was overwhelming and uncontroverted by anything other than Petitioner's own testimony, which the

jury did not find credible.

For the reasons stated herein, Petitioner has failed to show that counsel's decision not to strike these jurors constituted deficient representation or resulted in prejudice to Petitioner. Strickland, 466 U.S. at 687-88, 694. Consequently, this claim will be denied.

**4. AK-47**

Petitioner claims that counsel was ineffective for failing to object to testimony concerning his possession of firearms, particularly an AK-47 assault rifle, asserting that he never owned an AK-47. The record is clear, however, that counsel made a motion *in limine* to exclude admission of any evidence of firearms that were not used in the offenses of conviction. [Trial Tr. Vol. I, 5:5-10:11.] Counsel argued that admission of evidence that Petitioner owned dozens of firearms would serve only "to cast the defendant in a bad light to some jurors who may have personal beliefs against firearms" and that it would serve no prosecutorial purpose. [Id. at 7:12-14.] The Court denied the motion and noted an exception by the defense, thereby preserving the issue for appeal. [Id. at 10:8-1.]

Furthermore, the jury heard testimony that Petitioner did not own an AK-47, and that the weapon referred to by two of his daughters as an AK-47 was a Mack-90, which he had purchased at Wal-Mart. [Id. at 314:13-21, 320:4-9.]

The prosecutor thereafter referred to the weapon as a Mack-90. [Id. at 320:4-9.]

Finally, whether the rifle at issue was an AK-47 or some other type of firearm was not a material issue at trial. The import of the firearm was that Petitioner used it during the glass jar incident to threaten and intimidate his wife. It is not reasonably probable that Petitioner was convicted of any the counts based upon the jury's belief that he owned an AK-47. Strickland, 466 U.S. at 694. This claim will be denied.

### 5. **Venue**

Petitioner claims that counsel was ineffective for failing to move for a change of venue from the Bryson City Division to the Asheville Division within the Western District. Petitioner contends that news of his arrest and the allegations against him must have appeared in the Reservation newspaper and in the Swain County newspaper, thereby prejudicing the pool of potential jurors.

Among the protections guaranteed by the Sixth Amendment is the right to a fair trial by a panel of impartial jurors that determines a verdict "based upon the evidence developed at trial." Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). An impartial jury is one free from extraneous, prejudicial influence, whether it comes from inside or outside the

jury room. <u>Parker v. Gladden</u>, 385 U.S. 363, 363-65, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (finding habeas petitioner was deprived of his right to an impartial jury because of prejudicial remarks made to the jury by a bailiff).

The Supreme Court has found that defendants were denied a fair trial due to media publicity in two types of situations. The first was when the circumstances under which the trial was held were presumptively prejudicial. <u>Sheppard v. Maxwell</u>, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (presuming prejudice due to combination of inflammatory pretrial publicity, the re-election campaign of the trial judge, pretrial media interviews with jurors, and press presence within the bar of the court); <u>Estes v. Texas</u>, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (presuming prejudice where trial took place in circus-like atmosphere created, in part, by press sitting within the bar of the court, which was overrun by television cameras). For a jury to be presumed prejudiced by pretrial publicity, the publicity must rise to a level that renders court proceedings "a hollow formality." <u>Rideau v. Louisiana</u>, 373 U.S. 723, 726, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

The second situation was when the jury-selection process permitted an inference of actual prejudice. <u>Irvin</u>, 366 U.S. at 727-28 (inferring actual prejudice where, due to inflammatory publicity immediately prior to trial, eight of the defendant's 12 jurors had formed an opinion before the trial began that

the defendant was guilty). Actual prejudice may be inferred when jury selection indicates a level of hostility toward the defendant "as to suggest a partiality that could not be laid aside" by the jury. Murphy v. Florida, 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

There is no evidence in the record of *any* pre-trial publicity in Petitioner's case. Nor is there evidence in the record to indicate that the atmosphere and circumstances surrounding Petitioner's trial and sentencing were anything out of the ordinary. Additionally, none of the jurors questioned during voir dire had heard of Petitioner or the charges against him. Petitioner, therefore, has not identified any viable grounds upon which counsel should have moved for a change of venue.

Counsel cannot be deemed deficient for failing to file a motion that was unsupported by either fact or law. Furthermore, in light of the overwhelming evidence against him, Petitioner cannot show that had his trial been moved to Asheville, there is a reasonable probability that he would have been acquitted. Strickland, 466 U.S. at 694. Therefore, this claim will be denied.

### 6. Presentation of Petitioner's Testimony

Finally, Petitioner claims that trial counsel failed to prepare adequately for trial and failed to question him in a way that would have made his own direct examination to be more effective. With respect to the first portion of this

claim, Petitioner does not identify any investigatory or preparatory inadequacies on the part of counsel other than those addressed by the Court elsewhere in this Order. Consequently, he has failed to demonstrate that a genuine issue of material fact exists with respect to this allegation.

Likewise, Petitioner does not explain how counsel could have questioned him better or what information he was unable to present to the jury because of counsel's allegedly deficient questioning on direct examination. He does not identify any questions that counsel could have asked him that had a reasonable probability of producing a different result at trial. Again, Petitioner has failed to demonstrate that a genuine issue of material fact exists with respect to this allegation.

The Court has reviewed the record, including the transcripts, and finds that counsel was familiar with the facts and evidence in this case, that he filed motions to exclude and otherwise challenged evidence that he believed to be inadmissible, and that his direct examination allowed Petitioner ample opportunity to counter the testimony of his accusers. Petitioner has produced no evidence that counsel's representation was deficient or inadequate or that there is a reasonable probability that different decisions by counsel would have resulted in a different outcome for Petitioner. Strickland, 466 U.S. at 687-88, 694.

**Prosecutorial Misconduct.**

### 1. <u>AK-47</u>

In addition to claiming that the prosecutor intentionally elicited false testimony from his wife,[5] Petitioner claims that the prosecutor engaged in misconduct by eliciting testimony of Petitioner's ownership of numerous weapons, in particular an AK-47, solely for the purpose of prejudicing him before the jury. This claim is procedurally defaulted and without merit.

Generally, claims that could have been, but were not, raised on direct review are procedurally barred by default. <u>United States v. Pettiford</u>, 612 F.3d 270, 280 (4th Cir. 2010), *certiorari denied* 131 S.Ct. 620, 178 L.Ed.2d 454 (2010) (citations omitted). In order to collaterally attack a conviction or sentence based upon alleged errors that could have been pursued on direct appeal but were not, a petitioner must show cause and actual prejudice resulting from the errors complained of, or that he is actually innocent. <u>United States v. Mikalajunas</u>, 186 F.3d 490, 492-93 (4th Cir. 1999), *certiorari denied* 529 U.S. 1010, 120 S.Ct. 1283, 146 L.Ed.2d 230 (2000) (citations omitted).

Petitioner's misconduct claim could have been raised on direct appeal; everything necessary to adjudicate the claim can be found in the trial record. [Criminal Case No. 2:04cr38, Docs. 32, 35, 49, 50.] Petitioner does not argue

---

[5]This claim was denied previously. <u>See</u> discussion <u>supra</u> Part A.

cause and prejudice to excuse his failure to raise this claim on appeal; nor can he show actual innocence. Therefore, the claim is defaulted. Moreover, it is without merit.

The test for reversible prosecutorial misconduct is two-fold. Petitioner must show "(1) that the prosecutor's remarks or conduct were, in fact, improper and (2) that such remarks or conduct prejudiced the [Petitioner] to such an extent as to deprive [him] of a fair [proceeding]." United States v. Allen, 491 F.3d 178, 191 (4th Cir. 2007) (citation omitted). As counsel for the Government explained during the hearing on Petitioner's motion to exclude firearms evidence, the evidence was relevant to demonstrate to the jury the degree of control Petitioner maintained over his family and why the victims lived in fear that Petitioner would carry out threats to kill them. [Trial Tr. Vol. I, 8-10.]

At trial, the prosecutor presented evidence that Petitioner threatened to kill his wife, his children, and his wife's family, and that he had shot at his wife during an argument. [Id., at 96-97, 100, 188.] The Government also presented evidence that after the glass jar incident, Petitioner sat in a chair with a rifle over his knees and told his wife that he would be waiting for her and the police when she returned from the hospital. [Id., at 98, 205; 221-22, 233.] The prosecutor showed Petitioner's wife 20 firearms, all of which she

identified as belonging to Petitioner. [Id., at 101-104.] She testified that the presence of so many guns in the house contributed to her belief that he would carry through on his threats to kill her and her family. [Id., at 100.] In short, the prosecutor used the firearms exactly for the purpose that he stated in the hearing on the motion *in limine*, and such use was not improper.

Specifically as to the so called AK-47, it was Petitioner's daughters, "H.O." and "A.O.", who referred to the rifle Petitioner had after the glass jar incident as an "AK-47." [Id., at 203, 205, 233-34.] As previously noted, however, the jury heard testimony that Petitioner did not own an AK-47, and that the weapon referred to by his daughters was a Mack-90, which he had purchased at Wal-Mart. [Trial Tr. Vol. II, 314:13-21, 320:4-9.] The prosecutor thereafter referred to the weapon as a Mack-90. [Id., at 320.]

As also previously discussed, whether the rifle at issue was an AK-47 or some other type of firearm was not a material issue at trial. The import of the firearm was that Petitioner used it during the glass jar incident to threaten and intimidate his wife. Reference by two teenaged girls to that rifle as AK-47 did not prejudice Petitioner "to such an extent as to deprive [him] of a fair [trial]." Allen, 491 F.3d at 191. For these reasons this claim must also be denied.

### 2. Cannady Letter

Finally, Petitioner claims that the prosecutor's use at trial of a letter written by a fellow inmate, Darryl Cannady, amounted to misconduct. The letter purportedly contained prior statements Petitioner had made to Cannady that contradicted his testimony at trial. Petitioner complains that introduction of the letter deprived him of his right to confront and cross-examine the witness against him.

As was true of the previous claim of misconduct, this claim could have been raised on direct appeal but was not. Petitioner does not argue cause and prejudice to excuse his failure to raise this claim on appeal; nor can he show actual innocence. <u>Mikalajunas</u>, 186 F.3d at 492-93. Therefore, the claim is defaulted. <u>Pettiford</u>, 612 F.3d at 280. Moreover, it is without merit.

The Cannady letter was not introduced at trial as Petitioner contends, and the jury never saw its contents. Instead, the prosecutor cross examined the Petitioner with the letter in order to impeach Petitioner's testimony. [Trial Tr. Vol. II, 296-300.] The federal rules of evidence allow use of prior inconsistent statements to impeach the credibility of a witness. Fed. R. Evid. 607, 613. The prosecutor's use of the letter did not violate the rules of evidence or amount to misconduct. This claim will be denied.

# CONCLUSION

The Court has considered the Petitioner's motion, any attached exhibits, and the record of the prior proceedings. The Court finds that the Petitioner is not entitled to relief and therefore the motion must be dismissed. The Court further finds that the Petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong) (citations omitted). As a result, the Court declines to issue a certificate of appealability. Rule 11(a), Rules Governing Section 2255 Proceedings for the United States District Courts.

# ORDER

**IT IS, THEREFORE, ORDERED** that the Government's Motion for Summary Judgment [Doc. 12] is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that the Petitioner's Motion to Vacate, Set Aside or Correct Sentence [Doc. 1] is hereby **DENIED** and this action is hereby **DISMISSED**.

**IT IS SO ORDERED.**          Signed: March 3, 2011

Martin Reidinger
United States District Judge